UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

ETHAN ENNES,

                Plaintiff,                      Case No. 1:23-cv-10329

v.                                          Honorable Thomas L. Ludington
                                          United States District Judge
PRESQUE ISLE COUNTY, and
DAVE SCHMOLDT,

                Defendants.

_____/

**OPINION AND ORDER (1) GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, (2) DENYING EVIDENTIARY MOTIONS AS MOOT, AND (3) DISMISSING PLAINTIFF'S COMPLAINT**

From age seven to eighteen, Plaintiff Ethan Ennes—who has physical and cognitive disabilities—attended the Cheboygan, Otsego, Presque Isle Educational School District (COP) for his education. The COP manages a special education classroom in Onaway, Michigan. Plaintiff's experience in the COP classroom was volatile at times: he had a history of outbursts and violence, and it peaked in 2021.

While in the COP classroom on February 19, 2021, Plaintiff—then eighteen years old—attacked his teacher, a paraprofessional, and the school safety officer, Defendant Dave Schmoldt. Defendant Schmoldt attempted to subdue Plaintiff. But Plaintiff resisted, gouged Defendant Schmoldt's arms and face, threatened to kill him, and tried to take his taser and gun. Despite sustaining injuries, Defendant Schmoldt gained control and handcuffed Plaintiff. Defendant Schmoldt then took Plaintiff to Presque Isle County Jail.

Following the classroom incident, Plaintiff sued Defendant Schmoldt and his employer, Defendant Presque Isle County. Plaintiff alleges that Defendant Schmoldt violated his federal

constitutional rights and state law. He further alleges that Defendant Presque Isle County failed to adequately train and supervise its Sheriff's Deputies, including Defendant Schmoldt.

The Parties have since filed several evidentiary motions to limit the admissible evidence if this case proceeds to trial. But this case will not proceed to trial: Defendants moved for summary judgment, and their Motion will be granted. Thus, the Parties' evidentiary motions will be denied as moot, and Plaintiff's Complaint will be dismissed.

## I.

### A.

In 2002, Plaintiff Ethan Ennes was born prematurely. *See* ECF No. 39-2 at PageID.1734. As a result, Plaintiff has several cognitive and physical disabilities, including cerebral palsy and autistic tendencies. *See* ECF Nos. 39-4 at PageID.1748; 39-3 at PageID.1741; 39-5 at PageID.1763. And Plaintiff possesses an intelligence quotient (IQ) of 45 and an adaptive behavior composite (ABC)—an evaluation measuring communication and social skills—of 43, which are both in an "[e]xtremely [l]ow range." *See* ECF 39-3 at PageID.1742–45.

Because of these disabilities, Plaintiff has attended the Cheboygan, Otsego, Presque Isle Educational School District (COP) since he was seven. *See* ECF Nos. 25-3 at PageID.672; 39-5 at PageID.1758, 1763. COP manages a special education classroom in an Onaway Area Community Schools building in Onaway, Michigan. *See* ECF No. 25-3 at PageID.672; 39-7 at PageID.1828. When Plaintiff attended, the classroom's student body included six to eight students, with an approximate age range of eight to twenty-one years old. ECF No. 25-3 at PageID.672.

Plaintiff had a history of outbursts in the classroom and required substantial support to regulate his behavior. *See* ECF Nos. 25-3 at PageID.673; 39-7 at PageID.1832; 39-13 at PageID.1999. One outburst occurred on September 24, 2019. *See* ECF No. 39-13. That day, Jason

Raymond—Plaintiff's teacher—repeatedly reprimanded Plaintiff for using inappropriate language, threatening and hitting school staff, and damaging school property. *See id.* at PageID.2000–03. When Plaintiff learned that Mr. Raymond had prepared incident reports to share with Plaintiff's mother, Plaintiff tried to grab the reports. *Id.* at PageID.1999, 2004–06. After Mr. Raymond told Plaintiff to let go, Plaintiff struck him in the head. *Id.* Mr. Raymond and John Trotter—a paraprofessional in the COP classroom—then evacuated the classroom, at which point Plaintiff threatened to stab Mr. Raymond to death, ran to the classroom kitchen, and rifled through a kitchen drawer. *Id.*; ECF No. 25-4 at PageID.711–12.

Because of these threats, Mr. Raymond and Mr. Trotter called Defendant Dave Schmoldt—a Deputy for Defendant Presque Isle County's Sheriff's Department assigned as the school's safety officer—for help. *See id.*; *see also* ECF Nos. 25-2 at PageID.629, 633–34, 662–63; 25-4 at PageID.712. While waiting for Defendant Schmoldt and fearing that Plaintiff may grab a weapon in the kitchen drawer, Mr. Raymond approached Plaintiff, redirected Plaintiff's arms, and closed the drawer. ECF No. 39-13 at PageID.2005–06. So Plaintiff pushed Mr. Raymond, shoved Mr. Trotter, and ran to a different part of the classroom. *Id.*; ECF No. 25-4 at PageID.712. At that point, Defendant Schmoldt arrived and averted Plaintiff's attention, immediately pacifying Plaintiff. *Id.* at PageID.1999, 2006, 2009; ECF No. 25-4 at PageID.712.

Because of this incident, Defendant Schmoldt recommended criminal charges against Plaintiff. ECF No. 39-13 at PageID.1994–97. Six days later, the Presque Isle County Prosecutor charged Plaintiff with assault and battery. *Id.* at PageID.1994–96. But once the prosecutor learned more about Plaintiff's "limitations" and discussed them with Defendant Schmoldt, the prosecutor dismissed the case over concerns about the competency hurdles that prosecuting Plaintiff posed. *See* ECF Nos. 39-14 at PageID.2015, 2018; 25-2 at PageID.662–63.

**B.**

**1.**

The school year following Plaintiff's attack on Mr. Raymond, Christa Gahn replaced Mr. Raymond as the COP classroom teacher. *See* ECF No. 25-3 at PageID.672–73. But teacher turnover did not change Plaintiff's conduct. *See id.* at PageID.673–74, 684–85, 687. Indeed, according to Ms. Gahn, Plaintiff's behavior progressively declined. *Id.* at PageID.674. Some days, Plaintiff would get so aggravated that the COP staff sent him home early. *Id.* And during Plaintiff's episodes, the COP staff had to remove the other students from the classroom for their safety. *Id.* at PageID.674, 677.

February 19, 2021, was one of those days. *See* ECF No. 25-7 at PageID.757–59. That day, Plaintiff—who was eighteen at the time—was agitated because he wanted to visit his friend, but his friend's mother would not let him. *Id.* at PageID.756–57. When he went to school, Ms. Gahn allowed Plaintiff to select a movie for the class to watch during a class party. ECF No. 25-3 at PageID.676. Plaintiff later got upset about his choice, but Ms. Gahn calmed him down. *Id.*

The calm did not last. Plaintiff got upset again and, according to Ms. Gahn, instructed her to leave. *Id.* Soon after, Plaintiff asked to call his grandmother, and Ms. Gahn allowed him to do so. *Id.* at PageID.675, 677; ECF No. 25-4 at PageID.705. The conversation with his grandmother further aggravated Plaintiff because his grandmother reiterated that he could not visit his friend, so he started yelling. *See* ECF Nos. 25-3 at PageID.675, 677; 25-4 at PageID.705; 25-7 at PageID.757. After the call, Plaintiff turned his attention to Ms. Gahn, calling her a "bastard" and throwing a pen at her. ECF Nos. 25-3 at PageID.677; 25-4 at PageID.705. At that point, Ms. Gahn instructed Amanda Jones—a social worker who often worked in the COP classroom—to evacuate

the other students from the classroom, leaving only Ms. Gahn and Mr. Trotter in the room with Plaintiff. ECF Nos. 25-3 at PageID.677; 25-4 at PageID.705; 25-7 at PageID.758.

After Jones evacuated the other students, Plaintiff's aggression escalated. *See* ECF No. 25-3 at PageID.677. Plaintiff smashed the phone receiver into a wall and demanded that Ms. Gahn "[p]ause the mother fucking movie or" he would "teach [her] a lesson." *Id.*; ECF No. 25-4 at PageID.705–06. So Ms. Gahn paused the movie. ECF No. 25-3 at PageID.677. Still, Plaintiff flung his chair across the room and grabbed a pair of scissors. *Id.* at PageID.678; ECF No. 25-4 at PageID.706. According to Ms. Gahn, when Plaintiff grabbed the scissors, he said, "[n]ow I am going to take care of you." ECF No. 25-3 at PageID.678. Plaintiff then hurled the scissors at Ms. Gahn and Mr. Trotter, which flew by Ms. Gahn's head. *Id.*; ECF Nos. 25-4 at PageID.706; 25-7 at PageID.757. Shortly after, Plaintiff threw another chair. ECF No. 25-3 at PageID.678.

Ms. Gahn and Mr. Trotter tried to calm down Plaintiff but could not. *Id.* at PageID.675, 678–79. Plaintiff continued to throw objects, push tables, and flip them over, some of which struck Ms. Gahn and Mr. Trotter. *Id.* at PageID.679; ECF Nos. 25-4 at PageID.706–07; 25-7 at PageID.757–58. Plaintiff also repeated his threat that he was "going to teach" Ms. Gahn "a lesson." ECF No. 25-3 at PageID.679. According to Ms. Gahn, Plaintiff "had never [been] this escalated before." *Id.* So Mr. Trotter called Defendant Schmoldt. *Id.*; ECF Nos. 25-2 at PageID.639; 25-4 at PageID.707.

When Defendant Schmoldt received the call, he "hustl[ed]" to the COP classroom. ECF No. 25-2 at PageID.639. When Defendant Schmoldt arrived, he saw Amanda Jones and the COP students in the hall and heard yelling that resembled Plaintiff's voice. *Id.* at PageID.641. So Defendant Schmoldt entered the room and saw Plaintiff near the back with his fists clenched in a

fighting stance, walking toward Ms. Gahn and Mr. Trotter, who were keeping their distance. *Id.* at PageID.641–42, 656; ECF No. 25-3 at PageID.675.

At that point, Defendant Schmoldt successfully deescalated Plaintiff. To that end, Defendant Schmoldt positioned himself between Plaintiff and Ms. Gahn and Mr. Trotter. ECF No. 25-2 at PageID.642. Defendant Schmoldt then instructed Plaintiff to stop, and Plaintiff responded, "Officer Schmoldt, get [Ms. Gahn] out of here, she's pissing me off." *Id.* So Defendant Schmoldt diverted Plaintiff's attention, asking Plaintiff to talk about what happened. *Id.* After that, Plaintiff approached Defendant Schmoldt. ECF Nos. 25-2 at PageID.642; 25-3 at PageID.680. Defendant Schmoldt asked Plaintiff to sit down in a nearby chair so they could talk. ECF Nos. 25-2 at PageID.642; 25-3 at PageID.680; 25-4 at PageID.707–08. Plaintiff thus sat in the chair and remained calm for the time being. ECF Nos. 25-2 at PageID.642–43; 25-7 at PageID.758, 765; 25-3 at PageID.680; 25-4 at PageID.708.

But like before, the calm did not last. During Defendant Schmoldt's conversation with Plaintiff, Plaintiff pointed at Ms. Gahn and called her an "asshole." ECF Nos. 25-2 at PageID.643; 25-3 at PageID.680; 25-4 at PageID.708. Defendant Schmoldt told Plaintiff not to call her that, at which point Plaintiff said, "fuck you, you fucking cop." ECF Nos. 25-2 at PageID.643; 25-3 at PageID.680; 25-4 at PageID.708. Following these expletives, Plaintiff jumped out of the chair. ECF Nos. 25-2 at PageID.643; 25-3 at PageID.680.

A struggle ensued. Plaintiff grabbed a plastic pencil box off a nearby desk. ECF Nos. 25-2 at PageID.644; 25-4 at PageID.708; 25-7 at PageID.757–58. After Defendant Schmoldt instructed Plaintiff to put it down, Plaintiff threw it, hitting Defendant Schmoldt in the face. ECF Nos. 25-2 at PageID.644; 25-7 at PageID.757–58. Defendant Schmoldt then commanded Plaintiff to stop. ECF Nos. 25-2 at PageID.644; 25-3 at PageID.680. But Plaintiff ignored the command and tried

to punch Defendant Schmoldt, who caught Plaintiff's forearm. ECF Nos. 25-2 at PageID.644; 25-3 at PageID.680–81; 25-4 at PageID.708. Defendant Schmoldt then apprehended Plaintiff's other arm and told him to calm down. ECF Nos. 25-2 at PageID.644; 25-3 at PageID.680–81. Yet Plaintiff yelled, "I'm going to fucking kill you." ECF No. 25-2 at PageID.646; *see also* ECF No. 25-3 at PageID.680–81; *accord* ECF No. 25-7 at PageID.759. After that, Defendant Schmoldt continued to instruct Plaintiff to stop fighting and calm down, but Plaintiff broke one arm free and escalated the struggle—throwing punches, flailing his arms, and growling. ECF Nos. 25-2 at PageID.644; 25-3 at PageID.681. And although Ms. Gahn and Defendant Schmoldt say otherwise, Plaintiff claims that at some point while he was standing—which was after he attacked Defendant Schmoldt—Defendant Schmoldt kicked him.[1] *Compare* ECF No. 25-7 at PageID.767–68 *with* ECF Nos. 25-2 at PageID.659–60; 25-3 at PageID.680.

The struggle progressed to the ground. To subdue Plaintiff, Defendant Schmoldt used an arm-bar takedown on Plaintiff, and Defendant Schmoldt went to his knees beside Plaintiff. ECF Nos. 25-2 at PageID.644–45, 647. But the takedown did not end the action. *See* ECF Nos. 25-2 at PageID.645; 25-3 at PageID.681; 25-4 at PageID.708–09; 25-7 at PageID.758. Once on the ground, Plaintiff continued to fight—gouging Defendant Schmoldt's arms, trying to bite him, throwing punches, and refusing to comply with Defendant Schmoldt's commands. ECF Nos. 25-2 at PageID.645–46, 651; 25-3 at PageID.681; 25-7 at PageID.767–68. And Plaintiff claims that Defendant Schmoldt punched him in the head and ribs.[2] ECF No. 25-7 at PageID.758.

---

[1] Plaintiff alleges that Defendant Schmoldt's kick occurred after Plaintiff was out of the chair but before Defendant Schmoldt took him to the ground. ECF No. 25-7 at PageID.767–68. As a result, based on undisputed portions of the record and Plaintiff's testimony, the alleged kick would have occurred after Plaintiff jumped out of the chair and attacked Defendant Schmoldt.

[2] Plaintiff's grandfather, Dan Moran, also stated that Plaintiff told him later that day that Defendant Schmoldt choked Plaintiff. *See* ECF No. 39-18 at PageID.2110. But this purported statement is inadmissible hearsay because it was made too long after the classroom incident and after Plaintiff

The conflict continued. Because Plaintiff was gouging his arms and trying to bite him, Defendant Schmoldt put his forearm in the side of Plaintiff's head, steering it away from him. *See* ECF No. 25-2 at PageID.645–46; 25-7 at PageID.758. Defendant Schmoldt also warned Plaintiff that he would tase him if he did not stop fighting. ECF Nos. 25-2 at PageID.646; 25-3 at PageID.681; 25-4 at PageID.709. At that point, Defendant Schmoldt handcuffed Plaintiff's left wrist. ECF Nos. 25-2 at PageID.646, 653; 25-3 at PageID.682; 25-4 at PageID.709. Yet Plaintiff persisted and pulled his handcuffed arm away from Defendant Schmoldt, so Defendant Schmoldt grabbed the chain to avoid Plaintiff using the unclasped handcuff as "an edged weapon." *See* ECF Nos. 25-2 at PageID.653; 25-3 at PageID.682; 25-4 at PageID.709. And Plaintiff admits that during this bout, he resisted the handcuffs and gouged Defendant Schmoldt's face. ECF No. 25-7 at PageID.759; *accord* ECF No. 25-3 at PageID.682.

The situation escalated again. After cuffing Plaintiff's left wrist, Defendant Schmoldt states that he felt a tug on his weapons belt, and no one disputes why: Plaintiff tried to grab Defendant Schmoldt's taser. ECF Nos. 25-2 at PageID.646; 25-3 at PageID.682; 25-4 at PageID.709, 716; 25-7 at PageID.759. While fighting for the taser, Defendant Schmoldt says that Plaintiff shouted that he was "going to fucking kill" Defendant Schmoldt. ECF No. 25-2 at PageID.646. And during his deposition, Plaintiff affirmed that he wanted Defendant Schmoldt's taser to "tase him inside his mouth" and "[m]ake him eat it." ECF No. 25-7 at PageID.759. But Defendant Schmoldt foiled Plaintiff's plans, eventually removing Plaintiff's hand off the taser. ECF No. 25-2 at PageID.646.

---

had calmed down—meaning it is not subject to the present sense impression and excited utterance exceptions to hearsay under Federal Rules of Evidence 803(1) and (2). *See United States v. Penney*, 576 F.3d 297, 313–14 (6th Cir. 2009). And this Court cannot consider such evidence at summary judgment. *See infra* Section II.

Yet the conflict continued. After Defendant Schmoldt thwarted Plaintiff's attempt at the taser, Plaintiff reached for Defendant Schmoldt's gun. *See* ECF Nos. 25-2 at PageID.647; 25-4 at PageID.709, 716; 25-7 at PageID.758–59. Plaintiff stated that he grabbed for the gun because "he want[ed] to shoot" Defendant Schmoldt and kill him. ECF No. 25-7 at PageID.758–59, 761. But Defendant Schmoldt prevented these plans, too, by briefly putting one knee on Plaintiff's chest and instructing him to calm down—despite Plaintiff still scratching Defendant Schmoldt's arms while fighting for the gun. *See* ECF Nos. 25-2 at PageID.647–48, 664–65; 25-7 at PageID.759, 761. According to Plaintiff, Defendant Schmoldt also pushed Plaintiff's head into the ground after he reached for the gun. ECF No. 25-7 at PageID.761. After that, Defendant Schmoldt moved his knee back to the ground, put his chest on top of Plaintiff's to subdue him, and pinned down Plaintiff's hands on his chest. ECF No. 25-2 at PageID.648.

The fighting finally finished. Once Defendant Schmoldt placed Plaintiff's hands on his chest, Plaintiff calmed down. ECF No. 25-2 at PageID.648–49. So Defendant Schmoldt told Plaintiff to roll over and put his hands behind his back, and Plaintiff complied. *Id.* After Defendant Schmoldt handcuffed Plaintiff, Defendant Schmoldt sat Plaintiff in a chair, Plaintiff apologized, and Ms. Gahn and Mr. Trotter brought Defendant Schmoldt a rag to clean his face because he was bleeding. ECF Nos. 25-2 at PageID.649; 25-3 at PageID.682; 25-4 at PageID.709–10; 25-7 at PageID.759. Defendant Schmoldt then checked Plaintiff's handcuffs for tightness. ECF Nos. 25-2 at PageID.649.

By the time the dust settled, Defendant Schmoldt had sustained several injuries from Plaintiff gouging him:



ECF Nos. 25-8 at PageID.770, 771, 772, 774, 776; 25-2 at PageID.654, 657–58.

**2.**

Once Defendant Schmoldt had wiped his wounds, he called his supervisor, Sergeant Darin Rabeau. ECF Nos. 25-2 at PageID.649; 25-9 at PageID.787. Defendant Schmoldt explained what had occurred and sought Sergeant Rabeau's guidance on what to do. ECF Nos. 25-2 at PageID.649; 25-9 at PageID.787. Sergeant Rabeau instructed Defendant Schmoldt to bring Plaintiff to the Presque Isle County jail because Plaintiff had committed crimes: assault and battery and resisting and obstructing. *See* ECF Nos. 25-9 at PageID.788; 25-2 at PageID.649; 25-5 at PageID.724.

After his call with Sergeant Rabeau, Defendant Schmoldt walked Plaintiff to his patrol car. ECF No. 25-2 at PageID.650–51. At that point, the end of the school day approached, so Plaintiff's grandmother had arrived to take him home. *See id.* When Plaintiff's grandmother saw him handcuffed, she approached Defendant Schmoldt, and he explained what had happened and that Plaintiff was going to jail. *See id.* In response, she rushed to her car and drove away. *Id.*

Defendant Schmoldt then began his approximately twenty-five-minute drive to Presque Isle County's jail. *See id.* at PageID.651; ECF No. 25-9 at PageID.790. Plaintiff asserts that on the way to jail, the handcuffs started to hurt his wrists. ECF No. 25-7 at PageID.760, 764. Although Defendant Schmoldt remembers otherwise, when asked if he notified Defendant Schmoldt, Plaintiff responded that he did so. *Compare id.* at PageID.760, 767, 769 *with* ECF No. 25-2 at PageID.651. To that end, Plaintiff alleged that he stated, "Fuck you, Dave Schmoldt. . . . Take it off," and "Ouch" because the handcuffs hurt. ECF No. 25-7 at PageID.760, 764, 767. And Sergeant Rabeau—who Defendant Schmoldt called again during his drive—recalls that Defendant Schmoldt told him that Plaintiff complained about the handcuffs on the drive. *See* ECF No. 25-9 at PageID.792, 799. Yet Plaintiff admitted that he never asked Defendant Schmoldt to loosen the handcuffs. *Id.* at PageID.760, 767.

- 11 -

Even so, Defendant Schmoldt testified that if Plaintiff had complained, he could not have pulled over to adjust the handcuffs without first waiting for backup to meet him. ECF No. 25-2 at PageID.651. Indeed, shortly after Defendant Schmoldt left the school, Plaintiff's grandmother was waiting on the shoulder of the road for Defendant Schmoldt's patrol car and followed him to jail. *Id.* at PageID.651–52. At that point, Plaintiff's grandfather, Dan Moran, was in the vehicle. *Id.*; ECF No. 25-9 at PageID.790 792, 799. And because Moran had persistently threatened to kill Defendant Schmoldt for recommending Plaintiff's 2019 assault charges—prompting the Sheriff's Department to post officer safety notices about these threats—Defendant Schmoldt would not stop due to safety concerns. ECF Nos. 25-2 at PageID.651–52; 25-9 at PageID.790–92, 799.

When Defendant Schmoldt finally arrived at the jail, Sergeant Rabeau met him to help in-process Plaintiff. ECF No. 25-2 at PageID.652. Sergeant Rabeau removed Plaintiff's handcuffs, and both Sergeant Rabeau and Defendant Schmoldt remember seeing red marks on Plaintiff's wrists. *Id.* at PageID.653; ECF No. 25-9 at PageID.792. Medical records and pictures of Plaintiff's wrists reflect the same. *See* ECF Nos. 39-19 at PageID.2162–63; 39-20 at PageID.2202. But Sergeant Rabeau and Defendant Schmoldt suspected the marks were from either Plaintiff trying to pull his arm away when Defendant Schmoldt attempted to handcuff him during the struggle or Plaintiff moving around in the patrol car. ECF Nos. 25-2 at PageID.653; 25-9 at PageID.792.

In any event, Sergeant Rabeau and Defendant Schmoldt then explained to Plaintiff what happens when one is in jail. *See* ECF No. 25-2 at PageID.652. Plaintiff's mother spoke with Sergeant Rabeau on the phone and consented to the officers placing Plaintiff in a cell to "scare" him, so Sergeant Rabeau and Defendant Schmoldt did so. *Id.*; 25-9 at PageID.788. After that, the Sherriff's Department released Plaintiff to his grandparents. ECF No. 25-7 at PageID.760.

**C.**

Following the incident, Defendant Schmoldt recommended charging Plaintiff with assault and resisting and obstructing. ECF Nos. 25-2 at PageID.658–59; 25-5 at PageID.724. The county prosecutor felt it was a "classic resisting and obstructing case." ECF No. 39-14 at PageID.2015. But he declined to charge Plaintiff, citing competency concerns like in 2019. *Id.*

At some point, Plaintiff's mother lodged a complaint about Defendant Schmoldt arresting Plaintiff. *See* ECF Nos. 39-5 at PageID.1788; 39-24 at PageID.2237. Michigan State Police (MSP) Sergeant Nathan Groya investigated the matter. *See* ECF Nos. 39-24; 39-23 at PageID.2229–30; 39-25 at PageID.2255. The Michigan Attorney General's office then reviewed the investigation and declined to charge Defendant Schmoldt, concluding that Defendant Schmoldt used "reasonable force against" Plaintiff during the February 19, 2021 incident. *See* ECF No. 39-25 at PageID.2246.

After the Attorney General's office declined to bring criminal charges, Plaintiff filed this civil lawsuit on February 8, 2023. ECF No. 1. Plaintiff later amended his Complaint to correct a scrivener's error. ECF Nos. 14; 15. The Amended Complaint asserts five claims against Defendant Schmoldt related to Plaintiff's 2021 arrest: three allege constitutional deprivations under 42 U.S.C. § 1983 for excessive force and false arrest; two allege state-tort claims. ECF No. 15 at PageID.71–78. Plaintiff also brings a § 1983 claim against Defendant Presque Isle County, seeking to hold it liable as a municipality under *Monell* for allegedly failing to adequately train and supervise Defendant Schmoldt. *Id.* at PageID.78–80.

The Parties have since filed various motions. Indeed, the Parties have collectively filed eight pending evidentiary motions. ECF Nos. 22; 23; 49; 50; 51; 52; 53; 54. And on June 28, 2024, Defendants moved for summary judgment. ECF No. 25.

## II.

Summary judgment is proper when no genuine dispute of material fact exists, and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A genuine dispute of material fact exists if, based on the evidence presented, a reasonable jury could return a verdict for the nonmoving party. *Peffer v. Stephens*, 880 F.3d 256, 262 (6th Cir. 2018). When seeking summary judgment, the movant must identify parts of the record showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The burden then shifts to the nonmovant to "present significant probative evidence that will reveal that there is more than some metaphysical doubt as to the material facts." *Miller v. Maddox*, 866 F.3d 386, 389 (6th Cir. 2017) (cleaned up). Courts cannot consider a nonmovant's inadmissible hearsay evidence on summary judgment. *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 927 (6th Cir. 1999). And the mere existence of a scintilla of evidence supporting the nonmovant's position does not create a genuine dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

At this stage, courts cannot weigh the evidence presented. *Id.* at 249. Nor can courts assess the competency and credibility of witnesses. *Id.* at 255. And courts must draw all reasonable inferences for the nonmovant. *Finley v. Huss*, 102 F.4th 789, 804 (6th Cir. 2024).

## III.

### A. Constitutional Claims against Defendant Schmoldt

The analysis begins with Plaintiff's three 42 U.S.C. § 1983 claims against Defendant Schmoldt. ECF No. 15 at PageID.71–76. First, Plaintiff alleges that Defendant Schmoldt used excessive force during the arrest in violation of the Fourth Amendment (Count I). *Id.* at PageID.71–

73. Second, Plaintiff alleges that Defendant Schmoldt's force also deprived him of his Fourteenth Amendment rights under substantive due process principles (Count II). *Id.* at PageID.73–74. Third, Plaintiff alleges that Defendant Schmoldt falsely arrested him, depriving him of his Fourth Amendment rights (Count IV). *Id.* at PageID.75–76. Defendants seek summary judgment because, they argue, Plaintiff cannot establish that Defendant Schmoldt violated any constitutional right, and even if he could, Defendant Schmoldt is entitled to qualified immunity. ECF No. 25 at PageID.591–607.

Where applicable, qualified immunity protects government officials—including police officers—from civil liability. *Vanderhoef v. Dixon*, 938 F.3d 271, 276 (6th Cir. 2019). It applies to Plaintiff's § 1983 claims against Defendant Schmoldt unless his conduct violated Plaintiff's clearly established constitutional rights. *Finley*, 102 F.4th at 804 (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). This standard implicates two familiar questions: (1) Did Defendant Schmoldt's conduct violate Plaintiff's constitutional rights? (2) If so, were the rights clearly established on February 19, 2021? *See Ortega v. U.S. Immigr. & Customs Enf't*, 737 F.3d 435, 438 (6th Cir. 2013). This Court can address these questions in any order, and "if the answer to either question is 'no,'" then Defendant Schmoldt "is entitled to qualified immunity." *Finley*, 102 F.4th at 804–05. When filtered through these questions, none of Plaintiff's constitutional claims against Defendant Schmoldt survive summary judgment.

### 1. Fourth Amendment Excessive Force Claim

Start with Plaintiff's Fourth Amendment excessive force claim. The Fourth Amendment protects people from "unreasonable searches and seizures." *Vanderhoef*, 938 F.3d at 276 (citing U.S. Const. amend. IV). An officer using excessive force constitutes an unreasonable seizure, thus violating the Fourth Amendment. *Id.* And where, as here, a case involves excessive-force

challenges to multiple uses of force, courts must assess each use of force. *Wright v. City of Euclid*, 962 F.3d 852, 865 (6th Cir. 2020).

Plaintiff advances two excessive force theories. *See* ECF Nos. 39 at PageID.1702–15; 15 at PageID.70–72. First, Plaintiff argues that the force Defendant Schmoldt employed in subduing Plaintiff was excessive. Second, Plaintiff contends that Defendant Schmoldt applied Plaintiff's handcuffs too tightly. Each theory is addressed below.

### a. Force Used to Subdue Plaintiff

### i. Constitutional Violation

Plaintiff's first excessive force theory—that Defendant Schmoldt used excessive force at various points when subduing Plaintiff—lacks merit. To determine whether an officer's force was excessive, courts ask whether the force used was objectively reasonable. *VanPelt v. City of Detroit*, 70 F.4th 338, 340 (6th Cir. 2023). In so doing, courts must not apply the "20/20 vision of hindsight" from the "comfort of their chambers." *Id.* (cleaned up). Instead, courts must consider the perspective of a reasonable officer on the scene, understanding that "officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving— about the amount of force that is necessary." *Graham v. Connor*, 490 U.S. 386, 396–97 (1989).

Adopting that perspective, courts must ultimately analyze "whether the totality of the circumstances justifies a particular level of force." *Coffey v. Carroll*, 933 F.3d 577, 588 (6th Cir. 2019). Three factors guide this analysis: (1) the severity of the crime at issue, (2) the risk, if any, the suspect posed to the safety of the officer or others, and (3) the suspect's active resistance or evasion, if any. *Wright*, 962 F.3d at 865. Many cases "rise and fall with the third factor." *Shanaberg v. Licking Cnty.*, 936 F.3d 453, 456 (6th Cir. 2019). But here, all three factors establish that Defendant Schmoldt's force to subdue Plaintiff was reasonable.

First, the severity of the crime at issue suggests Defendant Schmoldt used reasonable force. Violent offenses warrant more force than others. *See Kapuscinski v. City of Gibraltar*, 821 F. App'x 604, 610 (6th Cir. 2020); *Shumate v. City of Adrian*, 44 F.4th 427, 441 (6th Cir. 2022) (distinguishing between nonviolent and violent components of an offense and emphasizing that violence is critical in the severity of the crime at issue inquiry); *Jackson-Gibson v. Beasley*, 118 F.4th 848, 854 (6th Cir. 2024) (same); *LaPlante v. City of Battle Creek*, 30 F.4th 572, 580 (6th Cir. 2022). Indeed, when a suspect is violent, even minor offenses can justify significant force. *See, e.g.*, *Cockrell v. City of Cincinnati*, 468 F. App'x 491, 495 (recognizing that even if the relevant offense is a misdemeanor, officers may be justified in tasing a suspect).

Here, Plaintiff's conduct was violent and thus a serious offense. Defendant Schmoldt did not use any force until after Plaintiff assaulted Ms. Gahn and Mr. Trotter and threw a plastic box at him. *See* ECF Nos. 25-2 at PageID.643–49; 25-3 at PageID.676–81; 25-7 at PageID.757–58. In other words, by the time Defendant Schmoldt used force, Plaintiff had attacked three people and committed a violent felony: resisting and obstructing a police officer. *See* MICH. COMP. LAWS § 750.81d(1). And despite Defendant Schmoldt's verbal commands, warnings, and deescalation tactics, Plaintiff continued to resist and harm Defendant Schmoldt, prolonging that violent conduct. *See id.* Put simply, Plaintiff's violent offense was sufficiently severe to justify Defendant Schmoldt's alleged kick, punch, takedown, and head push.

Second, the risk Plaintiff posed to those in the COP classroom strengthens the reasonableness of Defendant Schmoldt's force. True, Plaintiff had physical disabilities and was not armed, perhaps limiting his ability to harm Defendant Schmoldt, Mr. Trotter, and Ms. Gahn. *See Kent v. Oakland Cnty.*, 810 F.3d 384, 391 (6th Cir. 2016). But even if limited, Plaintiff still posed a substantial safety risk. Indeed, Plaintiff used classroom objects as weapons to attack Defendant

Schmoldt, Mr. Trotter, and Ms. Gahn throughout his outburst. *See* ECF Nos. 25-2 at PageID.644–48; 25-3 at PageID.678–82; 25-4 at PageID.706–09; 25-7 at PageID.757–59. Plaintiff also gouged Defendant Schmoldt's arms and face and made verbal threats of further physical harm. *See* ECF Nos. 25-2 at PageID.645–46; 25-7 at PageID.759, 767. And when Defendant Schmoldt pushed Plaintiff's head into the ground, Plaintiff had attempted to grab Defendant Schmoldt's taser and gun and threatened to kill him. *See* ECF Nos. 25-2 at PageID.646–48; 25-7 at PageID.758–59. In essence, without Defendant Schmoldt subduing Plaintiff with such force, Plaintiff—who had already harmed everyone in the room—could have gravely harmed someone else. *See Shumate*, 44 F.4th at 444 (noting that a suspect poses immediate threat to safety when he is violent and attempts to or does use force against an officer); *Kent*, 810 F.3d at 391 (citing *Caie v. W. Bloomfield Twp.*, 485 F. App'x 92, 94 (6th Cir.2012)).

Third, Plaintiff's resistance strongly supports that Defendant Schmoldt's force was objectively reasonable. When someone is actively resisting arrest, officers may use considerable force—like compliance strikes (kicking, kneeing, and punching to secure compliance), muscling techniques (including takedowns), tasers, batons, and pepper spray—to subdue the person. *See Rudlaff v. Gillispie*, 791 F.3d 638, 641–43 (6th Cir. 2015) ("When a suspect actively resists arrest, the police can use a taser (or a knee strike) to subdue him."); *King v. City of Rockford*, 97 F.4th 379, 396 (6th Cir. 2024) ("[W]e have deemed tasers, knee strikes, and other force necessary to subdue suspects justified where the suspects repeatedly refused to comply and physically resisted arrest."); *Jarvela v. Washtenaw Cnty.*, 40 F.4th 761, 765–66 (6th Cir. 2022); *Gambrel v. Knox Cnty.*, 25 F.4th 391, 402 (6th Cir. 2022) (collecting cases); *VanPelt*, 70 F.4th at 340 (takedown maneuver); *Williams v. Sandel*, 433 F. App'x 353, 362 (6th Cir. 2011) (baton strikes, pepper spray, and thirty-seven rounds of a taser reasonable to subdue a suspect who was high on LSD and actively resisting

arrest); *Bozung v. Rawson*, 439 F. App'x 513, 520 (6th Cir. 2011) (arm-bar takedown). One actively resists arrest "by physically struggling with police, threatening them, resisting handcuffs, or acting erratically." *Moore v. Oakland Cnty.*, 126 F.4th 1163, 1168 (6th Cir. 2025).

No doubt, Plaintiff actively resisted at all points that Defendant Schmoldt used force to subdue him. Plaintiff threw a plastic box at Defendant Schmoldt, threatened him, and attacked him before Defendant Schmoldt allegedly kicked Plaintiff. *See supra* n.1. Plaintiff then persistently gouged Defendant Schmoldt and struggled with him before Defendant Schmoldt took him to the ground and allegedly punched Plaintiff. *See* ECF Nos. 25-2 at PageID.643–49; 25-3 at PageID.676–81; 25-7 at PageID.757–58. And Plaintiff continued to battle Defendant Schmoldt, resisted handcuffs, and reached for his taser and gun before Defendant Schmoldt pushed Plaintiff's head into the ground. *Id.* All said, "[s]uch violent resistance" justifies "significant force in response," including the force Defendant Schmoldt used. *Gambrel*, 25 F.4th at 403 (noting that if a suspect resists handcuffs, disobeys repeated commands, kicks, punches, bites, and otherwise physically struggles with officers for multiple minutes, then repeatedly tasing and effectuating compliance strikes is reasonable force).

Despite all three factors favoring Defendant Schmoldt, Plaintiff argues that his cognitive disabilities—which Defendant Schmoldt knew about—are relevant and render Defendant Schmoldt's force excessive. *See* ECF No. 39 at PageID.1703–07. To Plaintiff's point, courts must consider a plaintiff's diminished capacity in excessive force analyses if the officer knew about the limitation when engaging the plaintiff. *See, e.g.*, *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 904 (6th Cir. 2004); *Martin v. City of Broadview Heights*, 712 F.3d 951, 962 (6th Cir. 2013); But these cases neither render such disabilities dispositive nor preclude officers from using force to subdue people with a diminished capacity. *Roell v. Hamilton Cnty.*, 870 F.3d 471, 482 (6th Cir.

2017) (citing *Cook v. Bastin*, 590 F. App'x 523, 530 (6th Cir. 2014)). Instead, Sixth Circuit cases only prevent officers from using substantial force against a person with such limitations without first attempting to "deescalate the situation and adjust the application of force downward." *Martin*, 712 F.3d at 962; *accord Roell*, 870 F.3d at 484.

Defendant Schmoldt did just that. From the time he entered the classroom, Defendant Schmoldt attempted to deescalate. *See* ECF No. 25-2 at PageID.642–43; 25-7 at PageID.758, 765. To that end, at first, Defendant Schmoldt succeeded and placated Plaintiff. *See id.*; ECF No. 25-7 at PageID.758, 765. It was not until after Plaintiff attacked Defendant Schmoldt that he first used force and allegedly kicked Plaintiff. *See supra* n.1. Even then, Defendant Schmoldt continued to use verbal deescalation tactics—like commanding Plaintiff to stop fighting and calm down and warning Plaintiff that he would tase him if Plaintiff did not stop—as the struggle progressed. *See* ECF No. 25-2 at PageID.644–48. And Defendant Schmoldt never escalated his force beyond compliance strikes and muscling techniques to, say, pepper spraying or tasing Plaintiff, which the Sixth Circuit has deemed reasonable in similar circumstances. *See, e.g.*, *Roell*, 870 F.3d at 484; *Williams*, 433 F. App'x at 362; *Gambrel*, 25 F.4th at 403; *Rudlaff*, 791 F.3d at 641–43.

In sum, the force Defendant Schmoldt used to subdue Plaintiff during their struggle was objectively reasonable under the circumstances. Indeed, Plaintiff committed a serious offense, posed a substantial safety risk, and violently and actively resisted Defendant Schmoldt's attempt to subdue him after Defendant Schmoldt tried to deescalate the conflict. Thus, Plaintiff cannot establish a constitutional deprivation under this excessive force theory.

### ii. Clearly Established

Even if Defendant Schmoldt used excessive force to subdue Plaintiff, it was not clearly established on February 19, 2021, so he is entitled to qualified immunity. A right is clearly

established when it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (cleaned up). This standard "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018). And plaintiffs bear "the burden of showing that the right was clearly established." *Bell v. City of Southfield*, 37 F.4th 362, 367 (6th Cir. 2022).

To meet their burden, plaintiffs must show that "[e]xisting law . . . place[s]" the "official's conduct 'beyond debate' such that any reasonable official would understand that [his] conduct was unlawful." *Finley*, 102 F.4th at 808 (cleaned up). Except for the rare obvious case, this means plaintiffs must provide an "on-point" Sixth Circuit or Supreme Court "case showing that reasonable officers would have known their actions were unconstitutional under the *specific* circumstances they encountered." *Id.* at 367–68 (emphasis added). If plaintiffs cannot do so, then the only way they can meet their burden is by pointing to a "robust consensus of cases of persuasive authority" that "places the violation beyond debate." *Finley*, 102 F.4th at 808 (cleaned up).

Plaintiff has not shown that Defendant Schmoldt should have known his actions were unconstitutional under the circumstances he encountered. Notably, Plaintiff does not argue that this is a rare obvious case. *See generally* ECF No. 39 at PageID.1717–19. Nor does Plaintiff gather a robust consensus of cases of persuasive authority. *See id.* Instead, he invokes individual cases to meet his burden. *See id.* None are persuasive.

Take Plaintiff's reliance on *Phelps v. Coy*, 286 F.3d 295 (6th Cir. 2002). There, officers arrested the plaintiff for violating an open container ordinance. *Id.* at 297. When booking the handcuffed plaintiff at the police station, the officers asked him to lift his feet to remove his shoes. *Id.* When the plaintiff complied, his feet neared one officer's face. *Id.* Another officer interpreted this as the plaintiff attempting to kick the officer in the face, so he tackled the plaintiff. *Id.* The

officer then sat on the restrained plaintiff, punched him in the face, and slammed his head into the ground three times. *Id.* The Sixth Circuit held that the officer's post-tackle force was objectively unreasonable because the plaintiff was "neutralized" and posed no threat when the officer imposed the force. *Id.* at 301–02. But distinctions between *Phelps* and this case abound: Unlike in *Phelps*, Defendant Schmoldt used force when Plaintiff posed a substantial safety risk, violently resisted, and was never neutralized.

Or take Plaintiff's reliance on *Bennett v. Krakowski*, 671 F.3d 553 (6th Cir. 2011). In *Bennett*, the plaintiff fled when officers approached the plaintiff in response to an attempted car theft. *Id.* at 556–57. But when the officers commanded the plaintiff to stop, he did so. *Id.* at 562. The plaintiff then laid on the ground with his arms extended. *Id.* Still, "the [o]fficers proceeded to punch him in the head, knee him in the back, push his face into the ground, and use a taser on him while he lay on the ground." *Id.* Because the plaintiff "was not resisting arrest" and did not take "any aggressive action against" the officers, the Sixth Circuit deemed the officer's force excessive. *Id. Bennett* differs from this case for similar reasons as *Phelps* does: *Bennett* featured a nonresistant, nonthreatening, and neutralized plaintiff; this case featured an actively resistant, aggressive, and unrestrained plaintiff. And these distinctions matter. After all, active resistance from an aggressive, unrestrained plaintiff "justif[ies] significant physical force in response," while passive or no resistance from a nonthreatening or neutralized plaintiff does not. *Gambrel*, 25 F.4th at 402–03.

And the remaining cases that Plaintiff cites are not only distinguishable on the same basis as *Bennett* and *Phelps* are, but they also suffer another fatal flaw—they are unpublished. *See McCaig v. Raber*, 515 F. App'x 551 (6th Cir. 2013) (unreasonable to takedown "a non-resistant or passively-resistant individual" who posed no safety risk); *Lawler v. City of Taylor*, 268 F. App'x

- 22 -

384 (6th Cir. 2008) (unreasonable to takedown detainee who was nonthreatening and then deal "serial strikes, which resulted in a broken arm, . . . after [he] had been subdued" by officer kneeling on his back); *Lustig v. Mondeau*, 211 F. App'x 364 (6th Cir. 2006) (unreasonable to repeatedly twist and jerk handcuffed plaintiffs arm who was "nonviolent and, at most, [a] passively resistant detainee while she [was] . . . restrained in a full control hold by two officers"); *Evans v. Plummer*, 687 F. App'x 434 (6th Cir. 2017) (unreasonable to takedown handcuffed plaintiff who "was not a threat and not actively resisting"); *Amerson v. Waterford Twp.*, 562 F. App'x 484, 487 (6th Cir. 2014) (unreasonable to kick and punch plainitff who "was lying on his stomach with his hands cuffed behind his back and offering no resistance"). Because unpublished cases are nonbinding, "a plaintiff cannot point to unpublished decisions to meet his burden" of showing that a right is clearly established. *Bell*, 37 F.4th at 367. Thus, Plaintiff's reliance on them is misplaced.

All said, even if Defendant Schmoldt's force was excessive—though it was not—Plaintiff has not produced a single case demonstrating that on February 19, 2021, a reasonable officer would have known that Defendant Schmoldt's conduct was unconstitutional under the circumstances he faced. In other words, it was not clearly established that Defendant Schmoldt's force violated Plaintiff's constitutional rights.

### b. Handcuffing

### i. Constitutional Violation

Plaintiff's handcuffing theory fares no better. Not all claims "of tight handcuffing . . . amount to excessive force." *Lyons v. City of Xenia*, 417 F.3d 565, 575 (6th Cir. 2005). To determine whether tight handcuffing amounts to excessive force, the Sixth Circuit applies a three-part test. *Hughey v. Easlick*, 3 F.4th 283, 289 (6th Cir. 2021). A plaintiff must show: (1) he complained that

the handcuffs were too tight; (2) the officer ignored those complaints; and (3) he suffered some physical injury as a result. *Getz v. Swoap*, 833 F.3d 646, 654 (6th Cir. 2016).

Here, if Plaintiff satisfied the other elements, the post-handcuff swelling and red marks on Plaintiff's wrist, corroborated by medical reports, are enough to create a genuine issue of fact on the third element.[3] *See Hughey*, 3 F.4th at 290 (collecting cases). Thus, this Court focuses on the closer elements, elements one and two.

Reading the record in Plaintiff's favor, Plaintiff has established a genuine issue of fact on the first element—namely, that he complained that the handcuffs were too tight. True, "indistinct" and unclear complaints are not enough to satisfy this element. *See Henry v. City of Flint*, 814 F. App'x 973, 983 (6th Cir. 2020) (holding the plaintiff saying, "the thing is cutting into my thing" and "my hand" did not satisfy this element). And Plaintiff saying, "Fuck you, Dave Schmoldt. . . . Take it off," and "Ouch," ECF No. 25-7 at PageID.760, 764, 767, without asking Defendant Schmoldt to loosen the handcuffs is not a particularly clear complaint. *See O'Malley v. City of Flint*, 652 F.3d 662, 671 (6th Cir. 2011). Yet those statements—coupled with Sergeant Rabeau's testimony that Defendant Schmoldt told Sergeant Rabeau that Plaintiff complained about the handcuffs on the way to jail—create a dispute of fact about whether Plaintiff "complained." *See Baynes v. Cleland*, 799 F.3d 600, 608 (6th Cir. 2015); *see also Hughey*, 3 F.4th at 290 (holding plaintiff complained about too-tight handcuffs by asking the officer "when he was going to remove her handcuffs").

---

[3] To be sure, the record does not conclusively reveal that a delay in removing unduly tight handcuffs caused the red mark and swelling on Plaintiff's wrist. Indeed, these marks may be attributable to Plaintiff yanking his handcuffed arm away from Defendant Schmoldt. *See* ECF Nos. 25-2 at PageID.653; 25-9 at PageID.792.

But Plaintiff has not satisfied the second element—that Defendant Schmoldt "ignored" his complaints. Plaintiff argues that this element is satisfied because Defendant Schmoldt did not check or remove them "until [Plaintiff] got to the jail." ECF No. 39 at PageID.1714. That argument misses the mark.

An officer ignores an arrestee's complaints when he outright refuses to respond to them, disregards them, or dismisses them in a way that is effectively non-responsive. *Baynes*, 799 F.3d at 609; *see also Morrison v. Bd. of Trustees of Green Twp.*, 583 F.3d 394, 402 (6th Cir. 2009) (holding the second prong satisfied when officer denied request to loosen and stated he could place handcuffs on "as tight as he wanted to and that's how they were staying"). But a delayed response alone does not amount to ignoring a complaint. *See Miller v. Sanilac Cnty.*, 606 F.3d 240, 252, n.8 (6th Cir. 2010) (noting that officers indeed do not "ignore" complaints when they immediately loosen or remove handcuffs, but "it can hardly be construed to mean that a longer response is automatically a violation"); *O'Malley*, 652 F.3d at 671 (quoting *Fettes v. Hendershot*, 375 F. App'x 528, 533 (6th Cir. 2010)) (explaining that "a constitutional requirement obligating officers to stop and investigate . . . every utterance of discomfort and make a new judgment as to whether the handcuffs are 'too tight' is" unreasonable); *Rudolph v. Babinec*, 939 F.3d 742, 751 (6th Cir. 2019) ("Conduct, not time, is the measurement of a violation."). And officers have more leeway when dealing with a resistant arrestee or other safety concerns. *See Getz*, 833 F.3d at 655 (arrestee resisted and acted belligerently); *Henry*, 814 F. App'x at 983 (resistance and safety concerns).

Here, Defendant Schmoldt did not disregard or refuse to respond to Plaintiff's complaints. When Defendant Schmoldt applied the handcuffs, he checked them for tightness, and Plaintiff did not complain. *See* ECF Nos. 25-2 at PageID.649; 25-7 at PageID.760, 767. Plaintiff allegedly first complained en route to jail—when Defendant Schmoldt could not safely stop. *See* ECF Nos. 25-2

at PageID.651–52; 25-7 at PageID.760, 767. And Plaintiff does not dispute that the safety concerns were real: Plaintiff's grandfather, Dan Moran, followed Defendant Schmoldt to the jail and had persistently threatened to kill him for arresting Plaintiff in 2019, prompting officer safety notices from the Presque Isle County Sheriff's Department. *See* ECF Nos. 25-2 at PageID.651–52; 25-9 at PageID.790–92, 799. After a short drive, when Defendant Schmoldt was secure inside the jail with Plaintiff, Sergeant Rabeau removed the handcuffs. ECF Nos. 25-2 at PageID.652; 25-9 at PageID.792. In other words, Plaintiff's complaints were unresolvable when he made them but resolved as soon as it was safe to do so. Thus, Defendant Schmoldt did not "ignore" Plaintiff's complaints. *See Getz*, 833 F.3d at 655–56; *Henry*, 814 F. App'x at 983.

And the safety risk preventing any response until Defendant Schmoldt reached the jail distinguishes this case from those where officers "ignored" an arrestee's complaints en route to jail. Those cases follow the same pattern: (1) the arrestee complains about the handcuffs' tightness before or on the way to jail, (2) the officers are readily able to respond, but (3) the officers choose not to until some later time. *See, e.g., Baynes*, 799 F.3d at 609; *Martin v. Heideman*, 106 F.3d 1308, 1310 (6th Cir. 1997); *Ouza v. City of Dearborn Heights*, 969 F.3d 265, 278 (6th Cir. 2020). Unlike those officers who "ignored" the arrestees' complaints, Defendant Schmoldt could not readily respond to Plaintiff's complaint, even assuming he made one.

In short, Plaintiff cannot show that Defendant Schmoldt ignored Plaintiff's alleged complaints under the circumstances Defendant Schmoldt confronted. As a result, no Fourth Amendment violation occurred.

### ii. Clearly Established

Even if Plaintiff's handcuffing theory presents triable issues, Defendant Schmoldt is entitled to qualified immunity. On February 19, 2021, it was not clearly established that reasonable

officers would know that Defendant Schmoldt's conduct—waiting to loosen or remove Plaintiff's handcuffs when stopping would risk (1) a confrontation with Plaintiff's grandfather, who had repeatedly threatened to kill him, or (2) another struggle with the resistant Plaintiff—was unconstitutional.

Before tackling the clearly established inquiry, some background on the Sixth Circuit's clearly established analysis for too-tight handcuffing theories is needed. To that end, the Sixth Circuit sorts too-tight handcuffing cases into two categories, and which category a case belongs in affects the clearly established inquiry. *See Getz*, 833 F.3d at 654–56.

The first is the *Baynes* category. The *Baynes* category consists of cases with arrestees "who were compliant" during the arrest "and gave officers no reason to delay responding to their complaints." *Id.* at 654 (citing *Baynes*, 799 F.3d at 604). If a case falls into that category and its facts establish a too-tight handcuffing violation, the two qualified immunity prongs effectively collapse into one, and the defendant is not entitled to qualified immunity. *See Baynes*, 799 F.3d at 614–16. This collapsed approach is because a compliant arrestee's "right to be free from . . . unduly tight handcuffing under the Fourth Amendment" has been "clearly established law" since 1991. *Id.* (collecting cases); *see also Hughey*, 3 F.4th at 293.

The second is the *Getz* category. Cases in the *Getz* category involve a noncompliant arrestee—that is, one who actively resisted arrest—or other safety reasons for a delayed response to the arrestee's complaints. *See Getz*, 833 F.3d at 654; *see also Henry*, 814 F. App'x at 983; *cf. Onwenu v. Bacigal*, 841 F. App'x 800, 813 (6th Cir. 2021). If a case is in this category and its facts reveal a constitutional violation, the plaintiff must separately satisfy the clearly established prong. *See Getz*, 833 F.3d at 654–56. In other words, the plaintiff must provide: (1) an "on-point" Sixth Circuit or Supreme Court "case showing that reasonable officers would have known their actions

were unconstitutional under the specific circumstances," *Bell*, 37 F.4th at 367–68; or (2) a "robust consensus of cases of persuasive authority" that "places the violation beyond debate," *Finley*, 102 F.4th at 808 (cleaned up). This difference is because an officer gets "additional leeway in his approach" when facing a noncompliant arrestee or other safety concerns, and caselaw must clearly establish that he exceeded that leeway. *Getz*, 833 F.3d at 655; *see also Henry*, 814 F. App'x at 983.

Now to sort this case. This case belongs in the *Getz* category for two reasons: Plaintiff actively resisted arrest, and Defendant Schmoldt faced other safety concerns. So Plaintiff must separately satisfy the clearly established prong. Plaintiff has not done so.

Plaintiff cites no cases notifying reasonable officers that Defendant Schmoldt's conduct was unlawful. *See generally* ECF No. 39 at PageID.1719–20. In fact, Plaintiff merely tries to distinguish *O'Malley v. City of Flint*, 652 F.3d 662 (6th Cir. 2011), where officers were entitled to qualified immunity for a brief delay in loosening an arrestee's handcuffs when the arrestee had no obvious physical injuries during the period of delay. *See id.* Even if *O'Malley* were inapposite, Plaintiff distinguishing a case where the law was not clearly established hardly places the unlawfulness of Defendant Schmoldt's conduct beyond debate. Sure, it might leave open Plaintiff's ability to overcome qualified immunity. But it remains Plaintiff's to do so by providing existing precedent that clearly established the alleged constitutional violation. *See Bell*, 37 F.4th at 367–68.

At any rate, existing precedent suggests that Defendant Schmoldt's conduct *is not* beyond debate. Indeed, like other cases where qualified immunity applied, the delay in removing Plaintiff's handcuffs was brief. *See Getz*, 833 F.3d at 655. Defendant Schmoldt also faced an arrestee who "resisted arrest" and "continued to address [Defendant Schmoldt] with abusive language," while balancing safety risks from Plaintiff's grandfather. *See id.*; *see also Henry*, 814 F. App'x at 983.

In the end, Defendant Schmoldt is entitled to summary judgment on Plaintiff's Fourth Amendment excessive force claim. Plaintiff cannot establish a constitutional violation under his two excessive force theories. And even if Plaintiff could, the violations were not clearly established on February 19, 2021, so qualified immunity applies.

### 2. Fourteenth Amendment Excessive Force Claim

Plaintiff also pursues an excessive force claim under the Fourteenth Amendment's substantive due process framework. This claim fails as a matter of law. Plaintiff does not contest that summary judgment for Defendant Schmoldt is warranted on this claim. *See* ECF No. 39 at PageID.1715. Nor could he. After all, the Fourth Amendment governs excessive force claims related to an arrest—not the Fourteenth Amendment's substantive due process principles. *Saalim v. Walmart, Inc.*, 97 F.4th 995, 1010 (6th Cir. 2024) (citing *Graham*, 490 U.S. at 395). Thus, Defendant Schmoldt is entitled to summary judgment on this claim.

### 3. Fourth Amendment False Arrest

Plaintiff's Fourth Amendment false arrest claim fails too. A plaintiff must show that the arresting officer lacked probable cause to succeed on a Fourth Amendment false arrest claim. *Hartman v. Thompson*, 931 F.3d 471, 483 (6th Cir. 2019). Probable cause is not "a high bar." *Wesby*, 583 U.S. at 57. To clear that bar, "an officer must identify only a 'substantial chance' that the suspect has committed a crime under all the circumstances that the officer confronted." *Farris v. Oakland Cnty.*, 96 F.4th 956, 963 (6th Cir. 2024) (cleaned up). And "[b]ecause this test requires far less than the reasonable-doubt standard necessary for a conviction at trial, the police can have probable cause even if it turns out that the suspect did not commit a crime." *Id.*

Here, Defendant Schmoldt had probable cause to arrest Plaintiff—at least—for resisting and obstructing under Michigan law. *See* MICH. COMP. LAWS § 750.81d(1) ("[A]n individual who

assaults, batters, wounds, resists, obstructs, opposes, or endangers a person who the individual knows or has reason to know is performing his duties is guilty of a felony."); *see also Barrera v. City of Mount Pleasant*, 12 F.4th 617, 622 (6th Cir. 2021). Indeed, Defendant Schmoldt crossed the probable cause threshold the moment Plaintiff yelled "fuck you, you fucking cop," and threw a plastic pencil box at him. *See* ECF Nos. 25-2 at PageID.643–44; 25-3 at PageID.680; 25-4 at PageID.708; 25-7 at PageID.757–58. He far surpassed that threshold when Plaintiff further attacked him, ignored commands, gouged him, refused handcuffs, and reached for his taser and gun. *See* ECF Nos. 25-2 at PageID.643–49; 25-3 at PageID.676–81; 25-7 at PageID.757–58.

Yet Plaintiff argues that Defendant Schmoldt lacked probable cause because when he arrested Plaintiff, he knew the county prosecutor had dropped Plaintiff's 2019 charges for competency reasons. *See* ECF No. 39 at PageID.1716. But Plaintiff's competency to stand trial had nothing to do with whether Defendant Schmoldt "identified a 'substantial chance' that" Plaintiff "committed a crime." *Farris*, 96 F.4th at 963. Not to mention, Plaintiff does not cite a single case to support that on February 19, 2021, it was clearly established that Defendant Schmoldt's arrest was unlawful, so Defendant Schmoldt is entitled to qualified immunity.

In sum, all of Plaintiff's federal claims against Defendant Schmoldt fail. Plaintiff did not establish a constitutional violation for any of these claims. And even if he did, those violations were not clearly established on February 19, 2021, so Defendant Schmoldt is entitled to qualified immunity.

### B. State-Law Claims Against Defendant Schmoldt

Turning to Plaintiff's state-law claims against Defendant Schmoldt. Plaintiff brings two state claims. ECF No. 15 at PageID.74–78. First, he asserts an intentional tort claim for assault and

battery (Count III). *Id.* at PageID.74–76. Second, he asserts a gross negligence claim (Count V). *Id.* at PageID.76–78. Neither survives summary judgment.

### 1. Assault and Battery

First, summary judgment for Defendant Schmoldt is warranted on Plaintiff's assault and battery claim. Defendant Schmoldt argues that he is entitled to governmental immunity under Michigan law for this claim. *See* ECF No. 25 at PageID.609–11. Defendant Schmoldt is correct.

Under Michigan law, an officer is immune from liability for intentional torts if he demonstrates three things: "(1) he acted during the course of employment and within the scope of his authority; (2) he acted in good faith; and (3) his actions were discretionary, not ministerial." *Naji v. City of Dearborn*, 120 F.4th 520, 525 (6th Cir. 2024) (citing *Odom v. Wayne County*, 760 N.W.2d 217, 218 (Mich. 2008)). The good-faith prong is subjective and protects officers from assault and battery claims who use force with a good-faith belief that "it was necessary." *See id.* (citing *Bletz v. Gribble*, 641 F.3d 743, 757 (6th Cir. 2011)). But officers only lack good faith when they act with "malice or wantonness or a reckless indifference to the common dictates of humanity." *Odom*, 760 N.W.2d at 225.

Plaintiff disputes the good-faith prong. *See* ECF No. 39 at PageID.1721. But nothing in the record suggests any force or threat of force Defendant Schmoldt used was with "malice or wantonness or a reckless indifference to the common dictates of humanity." *Odom*, 760 N.W.2d at 225. Rather, Defendant Schmoldt only used force when he needed to subdue Plaintiff and defend himself and others. *See Naji*, 120 F.4th at 526 (finding good faith when officer acted in self-defense and defense of others); *Bletz*, 641 F.3d at 758 (same, when officers needed to ensure their safety); *Latits v. Phillips*, 826 N.W.2d 190, 194 (Mich. Ct. App. 2012) (same, when force "was to ensure his safety and the safety of others"); *QC by Coker v. Lukes*, No. 366791, 2024 WL 4757824, at *7

(Mich. Ct. App. Nov. 12, 2024) (same, when officer restrained a student from attacking others). Further, Defendant Schmoldt checked Plaintiff's handcuffs for tightness when he first applied them, showing that he did not intend to harm Plaintiff with the handcuffs. *See* ECF No. 25-2 at PageID.649.

To the extent a delay in loosening or removing handcuffs can negate a good-faith finding, Defendant Schmoldt's reason was that he could not safely do so when Plaintiff complained. *See* ECF No. 25 at PageID.651–52. Plaintiff neither disputes that fact nor "present[s] evidence to establish any other motivation." *Latits,* 826 N.W.2d at 194. So nothing in the record supports a reasonable inference that Defendant Schmoldt acted maliciously. *See Oliver v. Smith*, 810 N.W.2d 57, 63 (Mich. Ct. App. 2010) (finding good faith when officer laughed at "unruly arrestee who was verbally belligerent, actively disturbing a police inquiry, and creating a dangerous situation for the" officer when arrestee asked the officer to loosen handcuffs because the record supported innocent reasons for the laughter); *cf. Thompson v. City of Detroit*, No. 361316, 2023 WL 6170536, at *9 (Mich. Ct. App. Sept. 21, 2023) (finding bad faith when officers did not check unduly tight handcuffs when they put them on and "several indicia of malice" like an unnecessary taser threat, a racial slur, and an unlawful failure to tell plaintiff why he was being arrested negated innocent explanations). Thus, Defendant Schmoldt is entitled to governmental immunity and summary judgment on Plaintiff's assault and battery claim.

## 2. Gross Negligence

Moving to Plaintiff's gross negligence claim. Under Michigan law, gross negligence "is not an independent cause of action." *Bletz*, 641 F.3d at 756. Instead, it "is a prerequisite to avoiding that official's statutory governmental immunity" from negligence claims. *Id.* In other words, "[f]or negligent torts, the governmental employee is" entitled to governmental immunity unless his

- 32 -

"conduct amounted to gross negligence that was the proximate cause of the injury or damage." *Latits*, 826 N.W.2d at 196 (cleaned up). Plaintiff's claim lacks merit for two reasons.

First, Plaintiff's claim hinges on the force Defendant Schmoldt used to subdue him and how tight he applied the handcuffs—the predicates for his failed excessive force claim. *See* ECF No. 39 at PageID.1723. But Michigan law "has rejected attempts to transform claims involving elements of intentional torts into claims of gross negligence." *VanVorous v. Burmeister*, 687 N.W.2d 132, 143 (Mich. 2004) *overruled in part on other grounds by Odom*, 760 N.W.2d 217. Accordingly, gross negligence is cognizable only when not "fully premised on" an intentional-tort claim. *Id.* That principle means "excessive-force claims disguised as gross-negligence claims," like Plaintiff's, are not viable. *Naji*, 120 F.4th at 526; *see also Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 408 (6th Cir. 2007).

Second, even if Plaintiff's claim did not sound in intentional tort, Plaintiff has not shown that Defendant Schmoldt's conduct amounted to gross negligence, so governmental immunity applies. To prove a gross negligence claim, evidence of ordinary negligence is insufficient—the plaintiff must show that "the contested conduct was substantially more than negligent." *Costa v. Community Emergency Med Servs, Inc*., 716 NW2d 236, 240 (Mich. 2006). Conduct amounts to gross negligence when it is "so reckless as to demonstrate a substantial lack of concern for whether an injury results." *Oliver*, 810 N.W.2d at 62 (quoting MICH. COMP. LAWS § 691.1407(8)(a)). Courts have also characterized gross negligence "as a willful disregard of safety measures and a singular disregard for substantial risks." *Id.* (cleaned up); *see also Williams v. City of Grand Rapids*, 672 F. Supp. 3d 395, 420 (W.D. Mich. 2023) (no gross negligence when there was a lack of evidence that defendants disregarded safety measures).

Plaintiff argues that the "totality of the circumstances . . . demonstrate that Defendant Schmoldt acted with reckless disregard for the safety and well-being of Plaintiff by . . . failing to recognize [Plaintiff's] cognitive and physical disabilities, ignoring his complaints that the handcuffs were too tight, not checking the handcuffs, and ignoring the obvious injuries to his hand and wrists from the handcuffs." ECF No. 39 at PageID.1724 (emphasis omitted). Not so.

None of Defendant Schmoldt's conduct demonstrates a "willful disregard of safety measures and a singular disregard for substantial risks." *Oliver*, 810 N.W.2d at 62 (cleaned up); *see also Maiden v. Rozwood*, 597 N.W.2d 817, 827 (Mich. 1999) (no gross negligence when resistant mentally ill plaintiff died of compressional asphyxia from unapproved restraint technique because of "the imminent danger posed by [his] volatile behavior" requiring rapid judgment calls). Defendant Schmoldt deescalated the situation when he first arrived in the classroom. *See* ECF No. 25-2 at PageID.642–43. He tried to deescalate Plaintiff with verbal commands throughout the struggle—yet Plaintiff continued to attack. *See id.* at PageID.644–48. He used less force than courts have permitted under similar circumstances. *See supra* Section III A, 1, a. He checked Plaintiff's handcuffs for tightness when he applied them, and Plaintiff initially did not complain. *See* ECF Nos. 25-2 at PageID.649; 25-7 at PageID.760, 767. The handcuffs were removed when safe to do so. *See supra* Section III, A, 1, b. And the red marks and swelling on Plaintiff's wrists were not egregious or obvious such that they would have been noticeable on Defendant Schmoldt's drive to jail. *See* ECF Nos. 25-2 at PageID.653; 25-9 at PageID.792; 39-19 at PageID.2162–63; 39-20 at PageID.2202.

In sum, neither of Plaintiff's state-law claims against Defendant Schmoldt survive summary judgment. Defendant Schmoldt is entitled to governmental immunity on Plaintiff's assault and battery claim. And Plaintiff's gross negligence claim lacks merit because (1) it is based

on intentional torts, and (2) Plaintiff did not demonstrate that Defendant Schmoldt's conduct amounted to gross negligence, so he is entitled to governmental immunity for his conduct.

### C. *Monell* Municipality Claim against Defendant Presque Isle County

Plaintiff's final claim seeks to hold Defendant Presque Isle County liable as a municipality for the alleged Fourth deprivations (Count VI). ECF Nos. 15 at PageID.78–80. But like Plaintiff's other claims, this claim lacks merit.

At the outset, Plaintiff's *Monell* claim suffers a fatal flaw. Indeed, "there can be no liability under *Monell* without an underlying constitutional violation." *Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014) (citing *Scott v. Clay Cnty.*, 205 F.3d 867, 879 (6th Cir. 2000)); *see also Przybysz v. City of Toledo*, 746 F. App'x 480, (6th Cir. 2018) ("As a threshold matter, there can be no municipal liability under *Monell* when there is no constitutional violation"). So because Plaintiff did not establish an underlying constitutional deprivation in the first instance, *see supra* Section III, A, summary judgment for Defendant Presque Isle County is warranted.

But even if a constitutional claim against Defendant Schmoldt survived summary judgment, Plaintiff's *Monell* claim against Presque Isle County still lacks merit. Under *Monell*, a county is not automatically liable under § 1983 for the constitutional violations of its employees. *Monell v. N.Y. City Dep't of Soc. Servs.*, 436 U.S. 658, 692 (1978). It is instead liable only when those violations flow from an "official policy" that effectively "cause[d]" the constitutional violation. *Id.* That policy can take one of four forms: (1) the city's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of failing to adequality training or supervise employees; or (4) a custom of tolerance or acquiescence of federal rights violations. *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) (citing *Monell*, 436 U.S. at 694). Plaintiff chooses the failure to train or supervise avenue and

argues that Defendant Presque Isle County's inadequate training caused the alleged excessive force. ECF Nos. 15 at PageID.78–80; 39 at PageID.1726–29.

To prevail on a failure-to-train-or-supervise claim, plaintiffs must establish three elements: first, that the municipality's provided inadequate training or supervision for the tasks performed; second, that this inadequacy stemmed from the municipality's deliberate indifference; and third, that the inadequacy was closely related to—or caused—the alleged injury. *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006). Deliberate indifference is no small showing. It is a "stringent standard of fault," requiring proof that a municipal actor "disregarded a known or obvious consequence of his action." *Shadrick v. Hopkins County*, 805 F.3d 724, 737 (6th Cir. 2015) (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997)). And to show deliberate indifference in the failure-to-train-or-supervise context, a plaintiff "ordinarily" must prove a pattern of similar constitutional violations by untrained employees. *Connick v. Thompson*, 563 U.S. 51, 62 (2011) (quoting *Brown*, 520 U.S. at 409). As a result, "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Id.* at 61. Here, Plaintiff has not met these stringent standards.

To start, Plaintiff contends that "Defendant Presque Isle County did not provide any training or supervision" to its Sherriff's Department related to using force. ECF No. 39 at PageID.1727. Yet the record suggests otherwise. True, the Department did not conduct formal performance evaluations. *See* ECF Nos. 25-2 at PageID.629; 25-9 at PageID.782; 25-12 at PageID.815. But it did other things to train and supervise deputies. For example, the Sheriff's Department sent Defendant Schmoldt to yearly training through the Schools Educators Police Liaison Association (SEPLA), which included use of force training in schools—and some scenarios with disabled individuals. ECF No. 25-2 at PageID.630–333. SEPLA also incorporated

annual training on handcuffing protocol. *Id.* at PageID.631. In addition, the Department received occasional legal updates from the county prosecutor. *See id.* at PageID.632. The Department also addressed using force in annual firearms training. *See* ECF No. 25-9 at PageID.782. And the Department had a use of force and arrest policy that at least some deputies reviewed and signed each year. *Id.* at PageID.785.

In any event, Plaintiff's failure-to-train claim fails for another reason: Plaintiff produced no evidence to show that Defendant Presque Isle County's alleged failure-to-train was borne out of its deliberate indifference. *See generally* ECF No. 39. Indeed, Plaintiff does not provide a pattern of constitutional violations or show that Defendant Presque Isle County omitted obvious and foreseeably necessary training. *See Connick*, 563 U.S. at 62–64; *see also Franklin v. Franklin Cnty.*, 115 F.4th 461, 474 (6th Cir. 2024). In fact, besides Plaintiff's mother complaining about Defendant Schmoldt, the record indicates Defendant Presque Isle County's Sheriff's Department did not receive a pattern of complaints about its deputies' use of force. *See* ECF No. 25-12 at PageID.816, 829.

In sum, all Plaintiff's claims lack merit. So Defendant's Motion for Summary Judgment, ECF No. 25, will be granted. As a result, the Parties' evidentiary motions, ECF Nos. 22; 23; 49; 50; 51; 52; 53; 54, will be denied as moot, and Plaintiff's First Amended Complaint, ECF No. 15, will be dismissed.

## IV.

Accordingly, it is **ORDERED** that Defendants' Motion for Summary Judgment, ECF No. 25, is **GRANTED**.

Further, it is **ORDERED** that Defendants' Motion to Strike Certain Experts, ECF No. 22, is **DENIED AS MOOT**.

Further, it is **ORDERED** that Defendants' Motion to Strike Defendants' Expert, ECF No. 23, is **DENIED AS MOOT**.

Further, it is **ORDERED** that Defendants' Motions *in Limine*, ECF Nos. 49; 50; 51; 52; 53, are **DENIED AS MOOT**.

Further, it is **ORDERED** that Defendants' Motions *in Limine*, ECF No. 54, is **DENIED AS MOOT**.

Further, it is **ORDERED** that Plaintiff's First Amended Complaint, ECF No. 15, is **DISMISSED**.

**This is a final order and closes the above-captioned case**.

Dated: March 26, 2025                              s/Thomas L. Ludington
                                                  THOMAS L. LUDINGTON
                                                  United States District Judge

- 38 -